A06A0596. CIEPLINSKI v. CALDWELL ELECTRICAL
CONTRACTORS, INC. et al.

(633 SE2d 646)

ANDREWS, Presiding Judge.

While working for Grove River Mills, Inc. (GRM), Mariusz Cieplinski accidentally stepped into an uncovered section of a moving conveyor used to transport corn and other animal feed material into the GRM feed mill. His leg was pulled into the conveyor, and he suffered a serious injury requiring amputation of the lower portion of the leg. Cieplinski received workers' compensation benefits from GRM for the job-related injury, then sued Henning Construction Company, Caldwell Electrical Contractors, Inc., and Fred Fairchild as third-party tortfeasors alleging that they proximately caused his injury by negligently installing the conveyor or negligently making subsequent improvements to the conveyor. Cieplinski appeals from the trial court's grant of summary judgment in favor of all the defendants. For the following reasons, we affirm.

> To prevail on a motion for summary judgment [under OCGA § 9-11-56 (c)], the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. The moving party may carry this burden either by (1) presenting evidence negating an essential element of the nonmoving party's claim, i.e., affirmatively disproving the element with evidence which makes it impossible for the nonmoving party to prove the element at trial; or (2) demonstrating an absence of evidence to support an essential element of the nonmoving party's claim. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. On appeal, we review de novo the trial court's ruling on a motion for summary judgment, construing all facts and reasonable inferences therefrom in the light most favorable to the nonmovant.

(Citations, punctuation and emphasis omitted.) *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 286-287 (520 SE2d 517) (1999); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

Applying these standards, the record shows the following: The feed conveyor in which Cieplinski was injured was manufactured by

Schlagel, Inc.[1] and installed by Henning Construction when Henning constructed the feed mill for GRM about two years prior to the injury. Fairchild, an engineer and a professor in the Department of Grain Science and Industry at Kansas State University, was hired by GRM as a consultant during the construction process to advise on feed mill design. As installed, the conveyor ran from the feed receiving area into the feed mill by means of a 107 foot long underground tunnel, which was accessible from both ends to allow inspection and maintenance on the conveyor. After the conveyor was installed, GRM hired Caldwell Electrical to put additional lighting in the tunnel.

On the day of the accident, Cieplinski testified that he noticed what appeared to be excessive dust coming from the conveyor tunnel, so he climbed down a ladder into the tunnel at the access on the feed mill end of the tunnel to inspect the conveyor while it was running to determine where the dust was coming from. Cieplinski knew that the tunnel was completely dark unless the lights installed in the tunnel were switched on. When he could not find a light switch in the tunnel on the feed mill end, he exited the tunnel at that end and asked someone at GRM where the light switch for the tunnel lights was located. He was told that the only light switch was at the other end of the tunnel at the access located in the feed receiving area. Although the tunnel had been built by Henning Construction with access at both ends, at some point after the conveyor was installed by Henning Construction, and after Caldwell Electrical installed additional lighting in the tunnel, GRM blocked access to the tunnel from the feed receiving end. GRM did this by closing the feed receiving access to the tunnel with a chain that could only be unlatched from inside the tunnel. Cieplinski testified that, because he was prevented by the chain from gaining access to the tunnel from the feed receiving end where the light switch was located, he got a flashlight and entered the darkened tunnel from the feed mill end with the intention of walking the length of the tunnel to reach the light switch at the other end. As Cieplinski stated at his deposition, "That way I could get better lighting inside the tunnel to see where the dust was coming from."

Cieplinski testified that, although he was aware there was a method by which he could have turned off the conveyor and locked it in the off position while he was in the tunnel, it was necessary for him to enter the tunnel with the conveyor running because that was the only way he could tell where the dust was escaping from the conveyor system. There is no evidence that the dust created a hazard at the

[1] Cieplinski also sued Schlagel as a third-party tortfeasor claiming the conveyor was defectively manufactured and designed, but he later dismissed these and other claims against Schlagel without prejudice.

feed mill or that the conveyor was not functioning properly when Cieplinski went into the tunnel. Cieplinski testified that he was concerned about the dust because "[i]t was more of an appearance look for the owners if they come in so it won't look kind of dirty and dusty." He told his boss that he was going into the tunnel to see where the dust was coming from, but he could not recall what his boss said in response.

Cieplinski walked along the tunnel across a concrete-floored access space with the conveyor to his immediate left elevated about two feet above the floor. Although there was dust in the tunnel that interfered with visibility, Cieplinski said he could see where he was going with the aid of the flashlight until he got about halfway through the tunnel, at which point the dust worsened and made it difficult to see. He considered going back, but decided he was close enough to the feed receiving end of the tunnel that he would try to find the light switch and then unlatch the chain and climb out of the tunnel at the feed receiving access. As he continued along the tunnel, Cieplinski said he could still see the conveyor immediately to his left. Evidence showed that the feed conveyor, as manufactured by Schlagel and installed by Henning Construction, was guarded by metal covers on all four sides. With the use of a tool, the metal cover on the top of the conveyor could be removed in sections, if necessary, to inspect and maintain the conveyor. The conveyor cover was labeled with warnings provided by the manufacturer stating: "CAUTION. COVERS and GUARDS are furnished for your SAFETY to avoid personal injury. They must be securely fastened in place before operating this equipment." Cieplinski testified that, as he walked along the tunnel, he could see that the sections of the top cover were in place on the moving conveyor. In fact, Cieplinski testified that he was told prior to the accident that it was GRM's policy to always keep the covers on the conveyor as a safety precaution.

As he approached the feed receiving end of the tunnel, Cieplinski encountered a tall pile of corn grain on the concrete floor in his path. Because of the increasingly heavy dust in the tunnel at that point, Cieplinski was unable to see that the section of cover on top of the conveyor adjacent to the pile of corn had been removed. Cieplinski testified at his deposition as follows:

> Q: As you got to this pile of grain toward the end of the tunnel, when did you notice that there was no cover on [the conveyor]?
> A: I could not see. Once I got to the last pile of corn, the conveyor section, it was real dusty and, therefore, I could not see that that one section had the cover off of it.
> Q: Did that seem to be where all the dust was coming from?

A: Yes, it was.

Q: The area that was not covered?

A: Yes, it was.

Q: And at no time before your injury were you able to visualize, yeah, here's the conveyor and this cover is off?

A: I never knew that that cover was off prior to that, my accident.

Q: Meaning that you could not see that it was off?

A: That's correct . . .

Q: All right, my question is because of the dust, you were unable to see one way or the other whether the conveyor cover was on or off?

A: That's correct . . .

Q: As I understand, you got to the top of this pile of grain and your left foot went into the conveyor?

A: I stepped over the pile. And as I was stepping into what I thought was a clear area, I stepped right onto the top of the open area of the conveyor belt.

Q: Did you think that you were stepping on top of a covered conveyor?

A: I thought I was stepping on the flat ground, the concrete. I did not think I was stepping on the conveyor at all.

Cieplinski further testified that he was trying to find the light switch at the end of the tunnel when he accidentally stepped into the uncovered conveyor, "[b]ut it was just so dusty, you could not see anything at that end."

Q: And you think that that's where the dust was coming from as a result of this [cover] being off?

A: That's correct.

Q: If [the cover] had been on, you don't think it would have been as dusty?

A: That's correct.

Q: If [the cover] had been on, you wouldn't have gotten hurt?

A: That's correct.

Q: And if [the cover] had been on, you would have been able to see better with that [flashlight]?

A: That's correct.

Cieplinski called for help from the tunnel as his leg was pulled into the moving conveyor, but no one responded. He was eventually able to pull his mangled leg free and climb up the access ladder at the feed receiving end of the tunnel, where he unlatched the chain on the access from the inside of the tunnel and exited to get help.

The general manager of the GRM feed mill at the time the accident occurred testified by deposition that he knew prior to the accident that GRM was operating the conveyor with a section of the top cover removed. He testified that, in August 2000, about three months before Cieplinski was injured, he was in the tunnel with the conveyor turned off doing a parts inventory and noticed that a section of the top cover on the conveyor near the feed receiving end of the tunnel was removed and that there was grain piled up on the tunnel floor in that area.

Q: [A]t the time you were looking at this conveyor and noticed that the cover was off?
A: Yes.
Q: Why didn't y'all decide to put the cover back on?
A: One, the cover was not visible, didn't know where it was. And I'm just — this is really hindsight, because we were very busy from the top of the mill to the bottom doing this inventory. We inventorized that particular section and moved to another piece of equipment.
Q: Was there any discussion about replacing the cover?
A: No.
Q: Either finding it or buying a new one or anything like that?
A: No . . .
Q: Was there any reason to leave the cover off in terms of getting the conveyor to operate the way you wanted it to operate?
A: No.
Q: Did you all have any sort of a program for cleaning grain from that tunnel on any sort of periodic basis?
A: No.
Q: When you were down there in August of 2000, was grain piled up in the receiving end of the tunnel?
A: Yes.
Q: Do you know what caused the grain to pile up?
A: That was the grain that they had backed up when they cleaned out the — when they reversed the [conveyor] motor to clean the drag up. That was the same corn.
Q: And that hadn't been cleaned up?
A: Correct.
Q: Was it piled up so that it was high enough to be at the top of the conveyor?
A: It was pretty much level or flush with the top of the conveyor.
Q: And I take it you didn't have any discussion with Henning

[Construction] about the fact that the cover was off in August of 2000?
A: No.
Q: And to your knowledge it remained off until the time of Mr. Cieplinski's accident?
A: Correct.
Q: Did Grove River Mills take any steps to warn any of its employees specifically or to advise any of its employees specifically that the cover was off the receiving end of the drag conveyor in the tunnel?
A: No.

The general manager further testified that the conveyor was operating normally at the time of Cieplinski's injury. Although the general manager testified that he had a policy to not send GRM employees into the tunnel, he could not recall whether he told Cieplinski about the policy, and he did not know whether Cieplinski's boss informed Cieplinski about the policy. As a result of Cieplinski's accident, GRM was cited and fined by the Occupational Safety and Health Administration (OSHA) of the U. S. Department of Labor for operating the conveyor without the cover in violation of OSHA regulations requiring that machine guarding be provided to protect employees from the hazards of exposed moving parts.

Cieplinski was barred by the exclusive remedy provisions of the Georgia Workers' Compensation Act (OCGA § 34-9-1 et seq.) from bringing a negligence claim against his employer, GRM, but the Act preserved his right to sue Henning Construction, Caldwell Electrical, and Fairchild as third-party tortfeasors alleging that their negligence caused his injury. To prevail on his causes of action for negligence, Cieplinski was required to prove the following essential elements: a legal duty to conform to a standard of conduct; breach of the duty; a legally sufficient causal connection (proximate cause) between conduct breaching the duty and the resulting injury, and damage flowing from the breach. *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982). While conceding that GRM's negligence was a proximate cause of his injury, Cieplinski sought to impose liability on the third-party tortfeasors by alleging that their negligence concurred with GRM's negligence to proximately cause his injury. *Allyn & Bacon Book Publishers v. Nicholson*, 58 Ga. App. 729 (199 SE 771) (1938). In support of these claims, Cieplinski provided expert testimony from a mechanical engineer.

As to Henning Construction, Cieplinski's expert testified that Henning installed a flat-bottom conveyor rather than a round-bottom conveyor, and that this choice along with other aspects of Henning's installation design (a lack of distance between the point where feed

material was received and the conveyor's tail pulley, and the angle at which the conveyor was installed) negligently left the conveyor subject to the possibility that it could clog excessively. Cieplinski contends that, because Henning's negligence caused the conveyor to clog, GRM was forced to remove the section of cover on the conveyor so it could properly operate. As to this negligence claim, Cieplinski's expert testified that it was normal for any feed conveyor to clog occasionally, and that he had no information indicating how often the GRM conveyor had actually clogged. The record shows that Cieplinski entered the tunnel while corn feed was being conveyed, and that the conveyor was not clogged at that time. There is no evidence in the record that the conveyor had clogged excessively. There was testimony showing that, on one occasion prior to Cieplinski's injury, GRM employees unclogged corn feed from the conveyor by removing a section of the top cover, reversing the direction of the conveyor, and letting the clogged feed flow out the uncovered section onto the floor adjacent to the conveyer. The evidence shows that, after doing so, GRM employees left the conveyor section uncovered and failed to remove the corn feed which piled up on the tunnel floor next to the uncovered conveyor. The GRM general manager gave undisputed testimony that leaving the section of cover off the conveyor after it was unclogged had nothing to do with allowing the conveyor to operate properly. Cieplinski points to testimony from another GRM manager indicating that the conveyor had "choked down." But that testimony referred to occasions when heavier limestone feed product was overloaded into the conveyor, or to a specific problem with the "high/low level indicators," which was fixed. Even if there was evidence that Henning Construction's installation design negligently increased the possibility that the conveyor could excessively clog, there is no evidence in the record to support Cieplinski's contention that this negligence caused excessive clogging or was a concurring proximate cause of his injury. In the absence of any evidence that the alleged negligence caused excessive clogging and forced GRM to operate the conveyor without the cover, there is no evidence that it was a proximate cause of Cieplinski's injury. It follows that the trial court correctly granted summary judgment in favor of Henning Construction on this negligence claim. *Bradley Center, Inc.*, 250 Ga. at 200; *Lau's Corp.*, supra.

Nevertheless, Cieplinski's expert further testified that Henning Construction (1) negligently failed to install an emergency pull-cord running the length of the conveyor that could have enabled Cieplinski to shut down the conveyor from inside the tunnel after the accident occurred and might have minimized his injury, and (2) negligently failed to install a second light switch for the tunnel lights at the access located at the feed mill end where Cieplinski entered the tunnel,

which would have enabled Cieplinski to turn on the tunnel lights when he first entered the tunnel. As to Fairchild, who was hired to advise GRM on feed mill design, the expert said he negligently failed to discover and correct Henning Construction's negligence. As to Caldwell Electrical, which was hired to put additional lighting in the tunnel, the expert testified that, like Henning Construction, Caldwell Electrical negligently failed to add a second light switch for the tunnel lights at the feed mill end of the tunnel.

Even if Cieplinski produced expert testimony establishing a factual issue as to whether Henning Construction, Caldwell Electrical, and Fairchild were negligent in failing to install an emergency pull-cord on the conveyor or in failing to put a second light switch in the tunnel, Cieplinski was required to prove as an essential element of these claims that the alleged negligence was a proximate cause of his injury. *Bradley Center, Inc.*, 250 Ga. at 200. The defendants moved for summary judgment on the basis that their original negligence, if any, was not a proximate cause of Cieplinski's injury because GRM's subsequent negligence intervened between their original negligence and the injury, and that GRM's negligence alone constituted the sole proximate cause of the injury.

In support of this defense, the record shows that, subsequent to the defendants' alleged negligence in failing to install an emergency pull-cord and a second light switch, GRM engaged in the following negligent acts or failures to act: (1) GRM used a chain (latched from inside the tunnel) to seal off access to the tunnel on the feed receiving end where GRM knew the only tunnel light switch was located, (2) GRM knowingly and without warning to its employees operated the moving conveyor with a section of the top cover removed in disregard of the manufacturer's warnings and in violation of OSHA regulations, and (3) GRM knowingly failed to remove a large pile of corn feed which accumulated on the tunnel floor adjacent to and level with the top of the uncovered conveyor section. As a result of GRM's negligence, Cieplinski was unable to use the access at the feed receiving end of the tunnel where the light switch was located, so he entered the darkened tunnel at the opposite end with a flashlight and walked the length of the tunnel to find the light switch. As he walked, the moving conveyor was to his immediate left elevated about two feet above the tunnel floor. When Cieplinski approached the feed receiving end of the tunnel where the light switch was located, he was unaware that one section of the conveyor top cover had been removed, and he was unable to see at that end of the tunnel because of thick dust billowing from the uncovered section. Near the feed receiving end of the tunnel, Cieplinski encountered the pile of corn feed blocking his path. To move past the pile, Cieplinski stepped to the top of the pile, which was level with the uncovered top of the conveyor, but he was still unable

to see the section of uncovered conveyor to his left because of the thick dust. As Cieplinski attempted to step down from the pile to the floor, he accidentally stepped from the pile into the uncovered section of the conveyor.

At issue on these facts is whether the original negligent acts of the defendants were concurring proximate causes of Cieplinski's injury, or whether GRM's subsequent negligence intervened and became the sole proximate cause of the injury.[2] The general rule applied to this issue was set forth by the Supreme Court in *Southern R. Co. v. Webb*, 116 Ga. 152 (42 SE 395) (1902) as follows:

> While the general rule is that if, subsequently to an original wrongful or negligent act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, still if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

Id.; *Blakely v. Johnson*, 220 Ga. 572, 574-575 (140 SE2d 857) (1965). In other words, even if the defendants' original negligence was to some extent a contributing cause of Cieplinski's injury and was a cause-in-fact of the injury, the original negligence is considered too remote to constitute the proximate cause of the injury if GRM's subsequent negligence was an intervening act which was not foreseeable to the defendants, was not triggered by the original negligence, and was sufficient by itself to cause Cieplinski's injury. *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (572 SE2d 533) (2002); *McAuley v. Wills*, 251 Ga. 3, 6-7 (303 SE2d 258) (1983). An intervening act of negligence which satisfies these conditions breaks the chain of causal connection for purposes of tort liability between the original negligence and the injury and becomes the sole proximate cause of the injury. *Ontario Sewing Machine*, 275 Ga. at 686. As a general rule, what amounts to proximate cause is a jury issue, but in plain and undisputed cases the issue will be determined by the court as a matter of law. *McAuley*, 251 Ga. at 7.

---

[2] For purposes of this analysis, we need not consider whether Cieplinski himself acted negligently in a manner that may have contributed to his injury.

We find that none of the third-party tortfeasor defendants could have reasonably anticipated or foreseen that GRM would negligently seal off the access where the tunnel light switch was located, and disregard the manufacturer's warnings and OSHA regulations by running the conveyor with a section of the cover removed. GRM's negligence was not triggered by the defendants' negligence, and it was clearly sufficient by itself to cause Cieplinski's injury. As to GRM's removal of the conveyor cover, which was a safety device designed to prevent the injury suffered by Cieplinski, we have previously held that "[t]he circumvention of the safety device, designed to prevent the type of injury which occurred, constitutes an unforeseeable intervening act sufficient to relieve [defendants] of negligence liability." *McNeely v. Harrison*, 138 Ga. App. 310, 313 (226 SE2d 112) (1976); *Ogletree v. Navistar Intl. Transp. Corp.*, 245 Ga. App. 1, 7 (535 SE2d 545) (2000). We hold that the plain and undisputed facts show as a matter of law that GRM's intervening negligence was the sole proximate cause of Cieplinski's injury, and broke any legally sufficient causal connection between the defendants' original negligence and the injury. Because Cieplinski failed to establish an essential element of his negligence claims — that the defendants' negligence was a proximate cause of his injury — the trial court correctly granted summary judgment to all the defendants. *Lau's Corp.*, supra. Although the trial court granted summary judgment in favor of Caldwell Electrical for other reasons, a judgment right for any reason will be affirmed. *City of Gainesville v. Dodd*, 275 Ga. 834 (573 SE2d 369) (2002).

*Judgment affirmed. Johnson, P. J., Blackburn, P. J., Miller, Ellington and Bernes, JJ., concur. Barnes, J., concurs in part and dissents in part.*

BARNES, Judge, concurring in part and dissenting in part.

Although a jury might consider the evidence in this case as the majority has and reach the same conclusion, it is not the function of this court to weigh the evidence and decide whether it was sufficient to prove the plaintiff's case. That role is reserved for the jury. *Roberts v. Dove*, 234 Ga. App. 853, 854 (1) (508 SE2d 213) (1998). Thus, because I believe that the majority and the trial court have intruded on the role of factfinder by concluding that Henning Construction's negligence was not the proximate cause of Cieplinski's injury, I must respectfully dissent from the affirmance of the trial court's grant of summary judgment to Henning Construction. As I find that the trial court properly granted summary judgment to Caldwell Electrical Contractors and Fred Fairchild for other reasons that will be discussed below, however, I concur in the judgment affirming those grants of summary judgment.

1. We must start from the time-honored principles that the routine issues of negligence cases are generally not susceptible of summary adjudication, *Robinson v. Kroger Co.*, 268 Ga. 735, 748 (2) (b) (493 SE2d 403) (1997), and that summary judgment should not be granted in these cases unless the nonexistence of liability is plain, palpable, and indisputable. *Ellington v. Tolar Constr. Co.*, 237 Ga. 235, 237 (227 SE2d 336) (1976). If reasonable minds can differ on the cause of the injury, the case is not plain, palpable, and indisputable and it should go to the jury. See *Bazemore v. MacDougald Constr. Co.*, 85 Ga. App. 107, 110 (1) (68 SE2d 163) (1951). Considering the conflicting evidence on the point in issue, this is not a plain, palpable, and indisputable case.

The evidence in this case shows that Cieplinski's expert witness is a professional engineer who specialized in conveyor safety and is the author of the only book on this subject. He testified that the conveyor was improperly designed and installed in such a fashion that the materials transported on the conveyor would build up and blockages would result. Although he had difficulty in determining how frequently this had happened, it was his opinion that this could happen very often. He also testified that the lights in the tunnel were improperly installed, that an emergency cord should have been installed, and that if an emergency cord had been available, Cieplinski's injuries could have been diminished.

This evidence, coupled with Cieplinski's testimony relating how this incident happened, is sufficient to create a jury issue on whether the combined negligence of Henning and Grove River Mills (GRM) was the proximate cause of Cieplinski's injury. Although the majority identifies several reasons why the expert's opinion should not be credited, judging the credibility of witnesses is a role for the jury, not this court. *Bowen Builders Group v. Reed*, 252 Ga. App. 54, 56 (555 SE2d 745) (2001). Also, the evidence about Cieplinski's possible negligence merely raises issues concerning contributory or comparative negligence. These are affirmative defenses on which Henning, not Cieplinski, would have the burden of proof, *Hodge v. Sada Enterprises*, 217 Ga. App. 688, 691 (2) (458 SE2d 876) (1995), and, nevertheless, under the disputed facts in this appeal, are not capable of resolution by summary judgment. *Ellington v. Tolar Constr. Co.*, supra, 237 Ga. at 238.

Ultimately, the burden will be on Cieplinski to prove his case by a preponderance of the evidence, but that is not his burden at this point. When responding to this motion for summary judgment, Cieplinski's burden is only to "point to specific evidence giving rise to a triable issue. OCGA § 9-11-56 (e)." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Given the testimony of Cieplinski's

expert, which we are not authorized to reject, I am satisfied that Cieplinski met his burden regarding the issue of proximate cause.

As for the issue of whether the negligence of GRM was an intervening cause,

> the general rule is that if, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote, still if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act. The rule that an intervening and independent wrongful act of a third person producing the injury, and without which it would not have occurred, should be treated as the proximate cause, insulating and excluding the negligence of the defendant, would not apply if the defendant had reasonable grounds for apprehending that such wrongful act would be committed.

(Citation and punctuation omitted.) *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002). "Moreover, it is axiomatic that questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases." (Citation and punctuation omitted.) Id. at 687. Here, given the expert's testimony that because of the improper design and installation, it was likely that the materials would build up and block the conveyor and that the tunnel was improperly lighted, a jury issue is created on whether it was foreseeable that as a result of the blockage, Henning could reasonably have anticipated, apprehended, or foreseen that GRM would take the actions that it did. Accordingly, this is not one of those plain and undisputed cases in which the issue of proximate cause may be resolved as a matter of law, and I must respectfully dissent from the affirmance of the grant of summary judgment to Henning Construction Company.

2. Although the majority affirms the grant of summary judgment to Caldwell Electrical Contractors because Cieplinski could not establish that its actions were the proximate cause of his injury, the trial court granted summary judgment to Caldwell based upon the acceptance doctrine. This doctrine provides that when

the work of an independent contractor is completed, turned over to, and accepted by the owner, the contractor is not liable to third persons for damages or injuries subsequently suffered by reason of the condition of the work, even though he was negligent in carrying out the contract, at least, if the defect is not hidden but readily observable on reasonable inspection.

(Citations and punctuation omitted.) *Peachtree North Apts. Co. v. Huffman-Wolfe Co.*, 126 Ga. App. 594 (191 SE2d 485) (1972). The record shows that Caldwell was hired by GRM to install lights in the tunnel consistent with OSHA standards, and after Caldwell completed the work, GRM accepted it. Therefore, even assuming that Caldwell was negligent in not installing another light switch in the tunnel, the absence of the light switch was readily observable on reasonable inspection and was not a hidden defect. Accordingly, the trial court did not err by granting summary judgment to Caldwell Electrical Contractors.

3. I would also affirm the grant of summary judgment to Fred Fairchild because, as a construction design professional, Fairchild cannot be liable as a matter of law. OCGA § 34-9-11 (a). Our Supreme Court has construed this section as creating

three express exceptions to the employee's right to sue a third party, granting immunity from tort liability to employees of the same employer, persons who provide workers' compensation benefits under a contract with the employer, and "construction design professionals."

(Footnotes omitted.) *Warden v. Hoar Constr. Co.*, 269 Ga. 715, 716 (1) (507 SE2d 428) (1998); *Cotton v. Bowen*, 241 Ga. App. 543, 545 (2) (524 SE2d 737) (1999). As defined in OCGA § 34-9-11 (b), a "construction design professional" is

any person who is an architect, professional engineer, landscape architect, geologist, or land surveyor who has been issued a license pursuant to Chapter 4, 15, 19, or 23 of Title 43 or any corporation organized to render professional services in Georgia through the practice of one or more such technical professions as architecture, professional engineering, landscape architecture, geology, or land surveying.

*Cowart v. Crown American Properties*, 258 Ga. App. 21, 23 (1) (572 SE2d 706) (2002).

This record shows that Fairchild, a professional engineer and university professor of grain science and industry, was retained as an advisor by GRM, Cieplinski's employer, to review Henning's plans for the mill and determine whether the feed mill would function as planned. He had no role in the design of the mill. Therefore, as Fairchild was a construction design professional within the meaning of OCGA § 34-9-11 (a) and (b), he is immune from suit, and the trial court's grant of summary judgment to him, even if on different grounds, is not reversible error. On appeal, a grant of summary judgment will be affirmed if it is right for any reason. *Malaga Mgmt. Co. v. John Deere Co.*, 208 Ga. App. 764, 767 (5) (431 SE2d 746) (1993).

Therefore, although I concur in the majority's affirmance of the grants of summary judgment to Caldwell Electrical Contractors and Fred Fairchild, albeit upon other grounds, I must respectfully dissent from the grant of summary judgment to Henning Construction Company.

DECIDED JULY 5, 2006.

*Matthews & Steel, John D. Steel, Douglas P. McManamy*, for appellant.

*Stewart, Melvin & Frost, J. Douglas Stewart, Carlock, Copeland, Semler & Stair, David F. Root, Hall, Booth, Smith & Slover, Mark W. Wortham, John C. Cheshire*, for appellees.