**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 21, 2024**

# In the Court of Appeals of Georgia

A24A0394. WILSON v. ALLIED PAVING CONTRACTORS, INC. et al.

BARNES, Presiding Judge.

While driving a dump truck owned by his employer, Allied Paving Contractors, Inc. ("Allied"), Mitchell Elder struck and either killed or disabled a cow in the middle of the roadway. A short time thereafter, Tracie Wilson also struck the cow, and the ensuing accident left her with severe and permanent injuries. Seeking compensation for those injuries, Wilson sued Allied and Elder, as well as the cow's owner, Miguel Rojas Jimenez.[1] Wilson now appeals from a trial court order granting summary judgment in favor of Allied and Elder, arguing that the court erred in concluding as a matter of law that neither Allied nor Elder had breached any duty owed to Wilson.

---

[1] Jimenez is not a party to this appeal.

For reasons explained more fully below, we agree with Wilson and we therefore reverse the trial court's order.

The record shows that at around 6:00 a.m. on October 19, 2019, two dump trucks left the Allied facility in Jackson County, traveling to pick up gravel in Cornelia. Both dump trucks were owned by Allied and were driven by Allied employees Elder and Billy Wiley. The route to Cornelia took the trucks north on State Highway 441 and, given this route, Elder and Wiley had agreed that they would stop at the Dairy Queen in Baldwin for breakfast.[2] Elder, who was driving the lead truck, testified that it was dark outside, and that the trucks were traveling at approximately 65 miles per hour. While traveling on an unlit stretch of highway, Elder glimpsed "a flash" of what appeared to be an eye, and his truck lights then illuminated what appeared to be the nose and face of a cow in the roadway. Elder estimated that he was less than five feet from the animal when he first saw it, and so he opined that perhaps "[a] second" elapsed between him seeing the cow and his truck making contact with it. The cow was black, which made it more difficult to see. Elder stated that he was driving on the

_____

[2] Elder explained that he ate breakfast at the Baldwin Dairy Queen whenever he had a job in that area.

right side of the divided highway and the cow was to the left of his truck, indicating that it was in the middle of the road.

Wiley was driving the second Allied dump truck, and he was traveling approximately two truck lengths behind Elder. Wiley witnessed Elder hitting the cow and explained that it looked to him as though Elder had attempted to avoid the animal, but was unable to do so. He also noted that Elder's brake lights came on after his truck made contact with the cow. When he passed the cow, the animal was down in the middle of the road, near the centerline, and the cow's leg struck the truck's hubcap as Wiley drove by. Following the incident, both Elder and Wiley proceeded to the Baldwin Dairy Queen, which Wiley estimated was eight or nine miles from the area where they encountered the cow.

Wilson was driving her Volkswagen Passat behind the Allied truck driven by Wiley, and traveling behind Wilson's car was an Allied crew truck. Dewey Anglin was driving the crew truck and he had another Allied employee as passenger. The men had not left Allied with the dump trucks that morning, and they were traveling to a different job site in Banks County. While sitting at a traffic light in Commerce, however, they saw the two dump trucks pass by on Highway 441, followed by

Wilson's car. When the light changed, Anglin turned and began driving behind Wilson's car, which he estimated was between 300 and 400 feet ahead of him.

After driving for approximately 15 miles, the two men saw sparks coming off the highway, and Anglin's co-worker stated that there was a cow on the side of the road. Anglin slowed the truck and saw that the sparks were coming from a car that was "flipping over" on the highway. The car came to rest upside down in a turn lane, so Anglin pulled his truck into the median, activated the strobe lights on the vehicle's roof, and shone his headlights on the accident scene. Anglin and his co-worker approached the car where they saw Wilson, who had suffered multiple injuries, including a severed arm.

The accident caused the Passat to dial Volkswagen's emergency service provider — CarNet — and CarNet received that call at approximately 6:11:30 a.m. Anglin and his coworker spoke with the CarNet operator, who asked them to wait with Wilson for emergency personnel. Both the CarNet operator and Anglin called 911, and an ambulance arrived approximately 10 minutes later.

Anglin testified that he was traveling at approximately 55 miles per hours and at times during the drive, he had been able to see the tail lights of the two Allied dump

trucks. He did not, however, see those lights at or around the time he and the co-worker saw the cow, even though the road was flat and the area was otherwise unlit.[3]

Despite this fact, and although Anglin did not witness Wilson's collision with the cow, he originally estimated that the second Allied truck was approximately 10 to 15 seconds in front of him. Anglin subsequently admitted, however, that he did not know how far ahead of him either Wilson or the Allied dump trucks were, in either time or distance, nor did he know how fast Elder was driving. Anglin also acknowledged that Elder "probably" had enough room at the accident scene to pull onto the shoulder and activate his strobe lights.

With respect to whether Elder knew he had hit the cow or when he suspected he might have hit the animal, the evidence was inconsistent. Elder stated that he did not pull over or stop at the scene because when he saw the cow, he did not see or hear anything indicating he had struck the animal. He also noted that the area was "pitch black dark." Elder then stated that after processing the situation, he realized he might have "clipped the cow." According to Anglin, however, he spoke with Elder the

---

[3] Like Elder, Anglin described the accident location as "pitch black dark."

afternoon of the accident, and Elder stated he knew he hit something, but did not know what the truck had made contact with.

At his deposition, Elder acknowledged that both the Allied safe driving policy and the rules applicable to commercial truck drivers in Georgia require drivers to stop at the scene of an accident and where possible, take steps to ensure the safety of other motorists. Elder further acknowledged that when a driver of a commercial vehicle hits an object in the roadway, he or she should stop as close to the scene as possible. When asked why, given his knowledge, he failed to stop at and/or return to the place where he struck the cow, Elder gave conflicting answers. First, he stated that he had never considered stopping at or returning to the scene because he did not "know for sure" that there was a cow — or anything else — in the roadway. But he also stated that once he realized he "clipped" the cow, he began looking for a safe place to pull off and that the Dairy Queen was the first lighted area he came to. Elder further acknowledged, however, that there were places near the scene where he could have stopped or turned around, but he deemed the Dairy Queen the "safest possible" place to stop.

After realizing he might have clipped the cow, Elder contacted his dispatcher, with that phone call taking place at 6:11 a. m. Elder told the dispatcher the situation and asked her to contact Banks County 911 and inform them a cow might be in the roadway. Elder also told the dispatcher that he was proceeding to the Baldwin Dairy Queen. According to Elder, he called the dispatcher "immediately" after he hit the cow, explaining that he did not wait until he reached the Dairy Queen.

The dispatcher testified that when Elder called, he told her that he had hit something that he thought was a cow. Elder and the dispatcher spoke for approximately two to three minutes, and agreed that the dispatcher would call 911. Elder then informed the dispatcher that he would proceed to an area where it was safe to exit the roadway and look for damage to the truck. Approximately three minutes after speaking with Elder, the dispatcher talked with Banks County 911, and the operator informed her that someone had already called to report that a cow had been hit.

After the accident, Wilson sued Allied and Elder, asserting claims against Elder for negligence and negligence per se, and asserting claims against Allied for respondeat superior and negligent hiring and retention. In support of her negligence

7

claims against Elder, Wilson alleged that the driver acted negligently when he failed to stop after striking the cow and to take steps to warn other motorists of the hazard created by the wounded or deceased animal in the roadway. Following discovery, Allied and Elder moved for summary judgment, arguing that Wilson's accident occurred only 30 seconds after Elder struck the cow and he therefore had no opportunity to pull over and warn other motorists of the hazard. Wilson opposed the summary judgment motion, aserting that the timeline evidence relied on by Allied and Elder showed only the time that Elder called dispatch and the time of Wilson's accident. That evidence, however, did not show when Elder's truck hit the cow. Additionally, Wilson submitted the report of an expert in accident reconstruction, who stated that based on 911 recordings made by other drivers who avoided colliding with the cow, one minute and 42 seconds elapsed between Elder's striking the cow and Wilson's accident. The expert also opined that there were at least four scenarios where Elder could have safely returned to the scene before Wilson's accident, and he created an animated video demonstrating each scenario.[4]

---

[4] Those scenarios included Elder slowing, making a U-turn, and driving back towards the cow in the median; moving into the median and backing up to the accident scene; and in both cases, using the dump truck's headlights to illuminate the cow.

The trial court granted the summary judgment motion finding, as a matter of law, that Elder could not have returned to the scene of the accident "without creating still more dangers to himself or other motorists on the highway." Thus, the court concluded that Elder — and therefore Allied — had "exercised the level of care that the law can reasonably expect under the circumstances." Wilson now appeals the trial court's order.

A grant of summary judgment is appropriate where the moving party demonstrates that there exists no genuine issue of material fact and that in light of the undisputed facts, the relevant law requires judgment in favor of the movant. See OCGA § 9-11-56 (c). A movant may carry this burden by showing, inter alia, that the nonmovant lacks evidence to support an essential element of his or her cause of action. *Cieplinski v. Caldwell Electrical Contractors*, 280 Ga. App. 267, 267 (633 SE2d 646) (2006). "In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably towards the party opposing the motion." (Citation and punctuation omitted.) *Hart v. Phung*, 364 Ga. App. 399, 400 (876 SE2d

9

1) (2022). We do not, however, "resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution." (Citation and punctuation omitted.) *Wang v. Dukes*, 368 Ga. App. 661, 661-662 (890 SE2d 283) (2023). And in conducting our review, "we bear in mind that the party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact." (Citation and punctuation omitted.) *Hart*, 364 Ga. App. at 400.

To prevail on her negligence claims against Allied and Elder at trial, Wilson must come forward with evidence showing that Elder had a legal duty to conform to a standard of conduct; that he breached that duty; and that Wilson suffered damages caused by that breach. See *Goldstein, Garber & Salama v. J. B.*, 300 Ga. 840, 841 (1) (797 SE2d 87) (2017). For over 60 years, Georgia law has held that where

> one by his own act, although without negligence on his part, creates a dangerous situation in or along a public highway and it reasonably appears that other users of the highway in the exercise of ordinary care for their own safety may be injured by the dangerous situation so created, the one creating the same is under a duty to eliminate the danger or give warning to others of its presence.

*Hardy v. Brooks*, 103 Ga. App. 124, 127 (2) (118 SE2d 492) (1961). Relying on this law, Wilson asserted that after hitting and either killing or disabling the cow, Elder had a legal duty to take steps to warn other motorists of the cow's presence in the roadway; that Elder had breached this duty; and that Elder's conduct was a proximate cause of her injuries. The trial court, however, found that Elder could not take any remedial action without increasing the danger to himself or others, and he was therefore under no duty to take such action. On appeal, Wilson argues that whether Elder could have safely taken remedial action was a factual question for the jury. We agree.

As a general rule, "[n]egligence is not susceptible to summary adjudication except where the evidence is plain, palpable, and indisputable that the respondent cannot present any slight evidence on each essential element of the action in rebuttal to create a jury issue." (Citation and punctuation omitted.) *Wang*, 368 Ga. App. at 664 (1). See also *Hart*, 364 Ga. App. at 406-407 (2). ("Questions of negligence, diligence, contributory negligence and proximate cause are peculiarly matters for the jury, and a court should not take the place of the jury in resolving them, except in plain and indisputable cases.") (citation and punctuation omitted.) Here, Wilson came forward with expert testimony opining that there were several steps Elder could have taken to

11

warn oncoming motorists safely and effectively of the hazard in the roadway in the time available to him. Additionally, other evidence also supported the conclusion that Elder could have taken some kind of remedial action. Elder himself testified that there was an area near the accident scene where he could have turned around, while Anglin testified that traffic was "very light" and that Elder "probably" could have pulled safely onto the side of the road. Moreover, the evidence showed that the Allied crew truck was able to pull into the grassy median and activate its rooftop strobe lights and that Elder's truck was also equipped with such lights. Thus, the evidence in this case as to whether it was possible for Elder to take action to alert other motorists to the hazard at issue was "not plain, palpable, and undisputed." *Spires v. Thomas*, 362 Ga. App. 344, 349 (2) (866 SE2d 856) (2021). Accordingly, it was for the jury to determine whether, given all the circumstances, Elder breached a legal duty to protect or warn other motorists of the hazard he created when he struck the cow. See *Hardy*, 103 Ga. App. at 127-128 (2) (whether five minutes was sufficient time to allow a motorist who had struck and killed a 900 pound cow in the roadway to remove the cow or take steps to warn other motorists was a question for the jury). See also *Hart*, 364 Ga. App. at 406-407 (1), (2) (reversing a grant of summary judgment to a driver who hit a

pedestrian crossing a four-lane highway at night and finding that testimony of an accident reconstruction expert created a jury question as to whether the driver could have seen the pedestrian in time to avoid the accident); *Spires*, 362 Ga. App. at 349-350 (2), (3) (finding that summary judgment in favor of driver who struck pedestrian was improper; a question of fact existed as to whether pedestrian was walking in or beside the roadway and, even if he was walking in the roadway, an expert report created a jury question as to whether the driver could have seen and avoided him).

Despite the flaws in the trial court's analysis, Allied and Elder argue that we should affirm the grant of summary judgment because the undisputed evidence shows that no more than 30 seconds elapsed between Elder striking the cow and Wilson's accident. They assert that given that fact, and because Wilson's own expert opined that it would have taken Elder at least a minute to take remedial action, there was nothing Elder could have done to warn Wilson and he therefore breached no legal duty. See *Georgia-Pacific, LLC v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013) ("A grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in

the trial court and the nonmovant had a fair opportunity to respond.") (citation, punctuation, and emphasis omitted). We find this argument to be without merit.

In support of their 30-second timeline, Allied and Elder rely on: (1) Elder's deposition testimony stating that he called dispatch "immediately" after hitting the cow; (2) Elder's cell phone records, showing he called dispatch at 6:11 a.m.; (3) the CarNet and 911 records indicating that Wilson's car alerted that service at 6:11:30 a.m.; and (4) Anglin's deposition testimony that he believed the Allied trucks were only 15 to 30 seconds ahead of him. Elder's statement that he called dispatch immediately after hitting the cow, however, is undermined by his testimony that he first had to process the situation and come to the conclusion that he might have hit the animal. Moreover, when read in context, his testimony that he called dispatch immediately could have referred to the fact that Elder did not wait until he had reached the Dairy Queen to contact the Allied office. Finally, although Anglin initially testified that he believed the Allied dump trucks were traveling approximately 10 to 15 seconds ahead of him, he eventually admitted that he had no idea how far ahead of him the Allied dump trucks were, in either time or distance. His testimony also established that he was driving approximately 10 miles per hour slower than Elder and

that although the road was flat and the area was dark, Anglin could no longer see the taillights of the dump trucks in front of him at the time he saw Wilson's car sliding across the highway. Accordingly, we agree with Wilson that the evidence in question only undisputedly establishes at what time Elder contacted dispatch and at what time Wilson's accident caused her car to contact CarNet.

In light of the foregoing, we find that the trial court erred in granting summary judgment in favor of Allied and Elder. Accordingly, we reverse the trial court's order.

*Judgment reversed. Gobeil and Pipkin, J. J., concur.*