*Fulwood & Skeen,* for plaintiff.

*H. S. Murray, R. D. Smith, J. S. Ridgdill,* for defendants.

---

## 5774.   LUMPKIN *v.* PROVIDENT LOAN SOCIETY INCORPORATED.

1. A landlord must keep in repair the premises which he has leased, unless the lease contains a stipulation to the contrary; but if there are patent defects, known to both parties at the time of executing the lease, and the lessee takes the premises as they are, he can not thereafter demand that the landlord remedy the defects.

2. Letters are not admissible in evidence without proof of their genuineness, and this proof can not be supplied solely by the fact that they were "received in the regular course of business."

3. Where a tenant under a lease testified that he occupied the premises for more than a year without experiencing any discomfort, and that then a restaurant was established, adjoining his office, in the same building, and that shortly thereafter he detected in his office a bad odor occasioned by food brought in by rats, presumably from the restaurant, and that the odor became so offensive that his office finally became untenantable; and where there was no evidence that the bad odors came from the restaurant itself, but it appeared that they were caused solely by the food so brought in, and where it was further shown that when the landlord was notified of the offensive smells he disinfected the premises, and did everything in his power to abate the odors, *held*, that the landlord was not liable for this condition, and the tenant was not thereby relieved from his obligation to pay the rent..

4. The evidence authorized the judgment, and there was no error in overruling the motion for a new trial.

DECIDED FEBRUARY 13, 1915.

Distraint; from municipal court of Atlanta. May 16, 1914.

*Smith, Hammond & Smith, John T. Hardisty,* for plaintiff in error.

*H. B. Troutman,* contra.

Broyles, J. The Provident Loan Society Incorporated sued out a distress warrant for rent against T. B. Lumpkin, in the municipal court of Atlanta. The trial judge, sitting without a jury, gave a judgment for the plaintiff, and refused to grant a new trial; and the appellate division of that court sustained his judgment; to which the defendant excepts.

1. The undisputed testimony showed that the office leased and occupied by the plaintiff in error was narrow, with no ventilation whatever except a door in the front, opening from the street, and a small transom in the rear, which opened into a dark unoccupied storeroom. The evidence showed, however, that he leased this office with full knowledge of its condition and arrangement, and remained there for more than a year without suffering any discomfort. And he can not now complain of defects which were in existence, and known to him, at the time of the lease. *Driver* v. *Maxwell,* 56 *Ga.* 12; *Aikin* v. *Perry,* 119 *Ga.* 263 (46 S. E. 93); 1 Tiffany on Landlord & Tenant, 599, 634.

2. The plaintiff in error, during the trial, sought to put in evidence two letters written by outside persons, in which the writers stated that the odor in his office was very offensive. He attempted to prove the execution of these letters merely by testifying that they "were received in regular course of business;" but there was no proof whatever of the genuineness of the signatures, and no witness attempted to identify the signatures as those of the persons whose names purported to be signed. The mere fact that these letters were received in due course of mail, and purported to be signed by these persons, was not sufficient to render them admissible in evidence; and the trial judge committed no error in ruling them out. *Freeman* v. *Brewster,* 93 *Ga.* 648 (21 S. E. 165); *Kent* v. *Wadley Southern R. Co.,* 136 *Ga.* 859 (72 S. E. 413).

3. This is a unique case. We have been unable to find another like it in any of the books. In the celebrated case of *Smith v. Marrable,* 11 Mees. & W. 5, it was held that where a house, at the time it was leased, was so greatly infested with bugs as not to be reasonably suitable for habitation, the tenant could quit it without

notice; there being an implied condition of law that the house was reasonably fitted for habitation. There is, however, a vital distinction between that case and the case at bar, for here the office was not infested with rats until more than a year subsequent to the making of the lease. In another English case (Collins *v.* Barrow, 1 Mo. & Rob. 112) it was held that the tenant was justified in quitting without notice premises which were noxious and unwholesome for want of proper sewerage. In that case it is clear that it was the landlord's duty, and one that he could easily have performed, to supply proper sewerage for the premises. It was said by the learned judge in Hart *v.* Windsor, 12 Mees. & W. 75, that "the word 'demise' has been held to imply a contract or covenant for quiet enjoyment and against eviction by title paramount; and an eviction by a nuisance which renders the premises uninhabitable ought to rest on the same footing. There is no greater reason for importing into the contract a covenant for quiet enjoyment than there is for implying a condition that the house is fit for habitation." But in that case the nuisance (bugs) was in existence on the premises at the time of the demise, and it was held (contrary to the ruling in the Smith *v.* Marrable case) that "there is no implied condition on the demise of real property that it is fit for the purpose for which it is let." In Paradise *v.* Jane, 23 Car. I, Sty. 47, Aleyn, 27, the defendant pleaded that "Prince Rupert and his army of aliens entered upon the demised premises and did drive away the defendant's cattle and expelled him from the lands let to him by the plaintiff, and kept him out, so that he could not enjoy the lands during the term; and it was holden that the plea was insufficient, and the defendant must pay the rent; for where a party by his own contract creates a duty or charge upon himself, he is bound to make it good, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract, and the rent is a duty created by the parties upon the reservation." So, in the case at bar, the plaintiff in error contracted to "deliver the premises at the expiration of the lease in as good order and repair as when first received, natural wear and tear excepted," and he could have stipulated in his contract that no restaurant should be put adjoining him, and that if one were so established, and by reason thereof his office should become infested with rats, or filled with odors therefrom, the lease should then terminate; but he did not so stipulate,

In Franklin *v.* Brown, 118 N. Y. 110 (23 N. E. 126, 6 L. R. A. 770, 16 Am. St. R. 744), where offensive odors from an adjoining tenement came into the demised premises, and neither the lessor nor the lessee knew of the existence of the odors when the contract was made, and the defendant occupied the premises, and neither ceased to occupy them nor attempted to rescind until the last quarter of the term, it was held that the lessor was not responsible for the bad odors, and that the lessee must pay the rent; and in that case the court said: "The cause of complaint did not originate upon the leased premises, was not under the control of the lessor, and was not owing to his wrongful act or default; it was simply a nuisance arising in the neighborhood, but neither caused nor increased by the house in question. Hence we are not called upon in this case to decide whether a lease of a furnished dwelling contains an implied covenant against inherent defects either in the house or in the furniture therein, but simply whether the lease under discussion contains an implied covenant against external defects which originate upon the premises of a stranger and were unknown to the lessor when he entered into the contract. . . What sound reason then is there for claiming that the law will imply a covenant as to conditions not in his contract, and with reference to which neither lessor nor lessee can reasonably be supposed to have contracted, as they knew nothing about them. . . If smoke from a neighboring manufactory had blown through the windows, or gas had escaped from a leaking main in the street and entered the house, could the lessee have abandoned the premises or called upon the lessor to respond in damages? We do not think that there was any covenant in the lease in question, implied either by common law or from the acts or relations of the parties, that extended to the grievance of which the defendant complains." In Edwards *v.* N. Y. &c. R. Co., 98 N. Y. 249 (50 Am. R. 659), the court said: "If a landlord lets premises and agrees to keep them in repair and he fails to do so, in consequence of which any one lawfully upon the premises suffers injury, he is responsible for his own negligence to the party injured. . . If he creates a nuisance upon his premises and then demises them, he remains liable for the consequences of the nuisance as the creator thereof. . . But where the landlord has created no nuisance, and is guilty of no wilful wrong or fraud, or culpable negligence, no case can be found

imposing any liability upon him for any injury suffered by any
person occupying or going upon the premises during the term of
the demise; and there is no distinction stated in any authority be-
tween cases of the demise of dwelling houses and of buildings to be
used for public purposes. The responsibility of the landlord is the
same in all cases. If guilty of negligence, or other *delictum,* which
leads directly to the accident and wrong complained of, he is liable;
if not so guilty no liability attaches to him." In Westlake *v.* De-
Graw, 25 Wend. (N. Y.) 669, it was held that the existence of a
noxious smell on the premises was not ground for a tenant's put-
ting an end to the contract.

The courts in Georgia have held that where the premises are ren-
dered untenantable *subsequently* to the lease, by the actions of a
cotenant, or a third person, the landlord can not be held respon-
sible. *Vason* v. *City of Augusta,* 38 *Ga.* 542; *White* v. *Montgom-
ery,* 58 *Ga.* 204; *Gardner* v. *Rhodes,* 114 *Ga.* 933 (41 S. E. 63, 57
L. R. A. 749). In the instant case the lease contained no express
covenant for the landlord to keep the premises in repair; but it is
true that under section 3699 of the Civil Code, he must, without
such a covenant, keep them in repair. *Gulhman* v. *Castleberry,* 48
*Ga.* 172; *Whittle* v. *Webster,* 55 *Ga.* 180; *Driver* v. *Maxwell,* 56
*Ga.* 12; *Lewis* v. *Chisholm,* 68 *Ga.* 40; *Dougherty* v. *Taylor,* 5 *Ga.
App.* 773 (63 S. E. 928). None of these authorities, however, con-
trol this case, for here no repairs were needed; the undisputed evi-
dence being that the physical condition of the premises was exactly
the same as when they were leased, and there was no evidence what-
ever that any repairs were required. Our Georgia statute, how-
ever, does not render the landlord liable for extraordinary and un-
foreseen occurrences. 1 Tiffany on Landlord & Tenant, 579. In
fact, the whole trouble of the plaintiff in error can be summed up
in one word—rats! It is true that the evidence discloses that the
office was badly ventilated, and one witness for the defendant in
error testified that was the cause of the bad odor; but the plaintiff
in error himself makes no such complaint; he puts the bad odors,
and the consequent untenantability of his office, squarely upon the
"offending heads" of the rats. There is no contention that the
rodents disturbed the office force by unseemly squeaking or squeal-
ing, or that they otherwise conducted themselves in any ungentle-
manly or unladylike manner, or that they gnawed his furniture, or

that they themselves had a bad odor; but the sole contention is that they brought in food, presumably from an adjoining restaurant (which was established about a year after the plaintiff in error leased his office), and that this food alone caused the offensive odors. The plaintiff in error, not being an object of charity, but a man of considerable means, strongly objected to having food thus brought in to him from his neighbors, and especially the kind that was furnished, he not being especially fond of "chicken bones," "fish heads," "scraps of cheese," "tripe," and such like delicacies. He testified that he disinfected the premises, but all in vain. He set traps, and every day caught scores of rats "as big as squirrels," but their numbers were no more diminished by his captures than were the ranks of the allies or the Germans by the "Battles of the Aisne." No traps, no disinfectants, "no nothing" could stop the onslaught of these hungry and persistent vermin; they were imbued with the true "Atlanta spirit," and continued with undiminished ardor their kindly meant but misunderstood attentions. Finally, in despair, the plaintiff in error, having no "pied piper" to entice them by the witchery of his music to their destruction in the "rolling waters of the river Weser" (or the Chattahoochee), cut the "Gordian knot" by breaking his lease and moving to another and distinct building. We do not think that, under the law and the evidence, the landlord can be held responsible for the action of the rats. It is clearly established that there was no bad odor in the premises of the plaintiff in error until after the adjoining restaurant was opened (about a year after the plaintiff in error leased his office), and that the odor was caused entirely by food brought in, presumably from that restaurant, by rats. There was no evidence to show that the restaurant was a nuisance, or that it was improperly conducted. The plaintiff in error himself declared in his testimony that he could not swear that it was a nuisance, and that he did not desire it closed up, as it was not responsible for his troubles, and the landlord offered to remove the restaurant if the plaintiff in error would swear that it was a nuisance, and the plaintiff in error declined to do so, saying it was not to blame. If the restaurant which caused the influx of the rats, and was thereby indirectly responsible for the odor, was not to blame, how could the landlord be held responsible for the actions of these pests?

There is, however, another plea which the plaintiff in error might

have set up by way of recoupment, which would have received our careful and sympathetic consideration. The fear of rats, and even of mice, entertained by the fair sex, is proverbial, and this court will take judicial cognizance of the fact that any real-estate office overrun by such vermin would lose all patronage of the ladies, and would be entirely deprived of the refining and elevating influence of their presence, to say nothing of the more substantial emoluments derived from business dealings with them. If the plaintiff in error had rested his case on this ground, at once solid and sentimental, this court (though all of its members are staid and settled married men, but, like all men of intelligence and discernment, fond of the beautiful) would have diligently sought to find a way to relieve him, if not by the harsh and inflexible rules of law, then by the softer and more pliant ones of equity. But the plaintiff in error (possibly through fear of his better half) not having made this plea, the only thing we can do, while affirming the judgment against him, is to tender our congratulations upon the fact that at last he has escaped from his too attentive friends (?)—the rats.

*Judgment affirmed.*