**WHOLE COURT**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 18, 2016**

# In the Court of Appeals of Georgia

A16A1090. GEORGE v. HERCULES REAL ESTATE SERVICES,    DO-045
     INC.

DOYLE, Chief Judge.

Derrick George filed a premises liability action against Hercules Real Estate Services, Inc. ("Hercules"), the manager of the apartment complex in which George lived when he was shot by unknown assailants during a home invasion. George asserted claims for negligence, nuisance, and punitive damages. Hercules answered and filed a counterclaim for unpaid rent and other fees. The trial court granted summary judgment to Hercules as to all of George's claims and as to Hercules's counterclaim, and George appeals. For the reasons that follow, we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal

from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[1]

So viewed, the record shows that George moved into an apartment in The Villas at Lakewood in November 2010. On June 11, 2011, while he was not home, George's apartment was burglarized between the hours of midnight and 2:00 a.m. In response to the burglary, Hercules repaired George's damaged front door and installed a metal burglar guard, which made the door more secure when locked, but also made it difficult to engage the deadbolt. George's apartment also had an alarm system that was monitored 24 hours per day and included a front-door panic button in each unit, including George's. According to George, after the burglary, he obtained a shotgun and kept it beside the front door for protection because he believed the complex was not safe.

In the early morning hours of July 27, 2011, George was home with a friend when someone knocked on his door. George turned on the front porch light, looked through the peephole, and asked who was there; he could see only the silhouette of

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

2

a single individual, and he could not hear the person on the other side of the door. Although he was not expecting anyone at the time, George opened the door, propping his foot against it out of concern for his safety. When George opened the door, a second individual emerged, and he and the first man tried to force their way into George's apartment. George pushed back and tried to lock the door, but he was unable engage the deadbolt. George grabbed his shotgun and fired at the intruders. The intruders fired back, shooting George four times. The police never apprehended or identified the intruders. After the shooting, George did not return to his apartment nor did he pay rent for the apartment.

Hercules was aware of prior crimes at the apartment complex[2] and employed a private security service during day hours. Prior to the shooting, in May 2011, Hercules's on-site manager requested that the corporate office provide additional security for the complex, but Hercules did not comply with the request.

---

[2] The summary of incident reports between 2009 and 2011 showed the incidents involved mostly break-ins or unlawful entries to both occupied and empty units. Incident reports also showed armed robberies, a shooting by a tenant's grandson with no injuries, and "the improper handling of a female sexually." In 2009, a non-resident's body was found dead at the gate with a gunshot wound. The incident report summary also showed that there was no reported crime between August 5, 2008, and December 19, 2008, or between August 9, 2010,and April 20, 2011.

George sued Hercules, asserting claims for negligence, nuisance, and punitive damages. With regard to his negligence claims, he alleged that Hercules failed to (1) keep the premises in proper repair; (2) provide adequate security; and (3) keep the premises safe. Hercules asserted a counterclaim against George for unpaid rent and moved for summary judgment on all claims. The trial court granted summary judgment to Hercules on all claims, and this appeal followed.

1. *George's claims*. Because the record is devoid of any competent evidence to create a question of fact on the element of causation, Hercules was entitled to summary judgment as to George's claims.[3]

(a) *Negligence*. There are four elements to a negligence claim in Georgia:

> (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or

---

[3] Although the trial court granted summary judgment to Hercules on separate grounds, Hercules raised the lack of proximate cause as its lead argument in support of its motion for summary judgment. We review the grant or denial of summary judgment de novo, and "a judgment right for any reason will be affirmed." *Cieplinski v. Caldwell Elec. Contractors*, 280 Ga. App. 267, 276 (633 SE2d 646) (2006).

damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.[4]

On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant.[5]

As the movant, Hercules offered evidence that as part of a $7 million renovation of the property, it installed in each unit a monitored security alarm equipped with a panic button in each unit; added exterior security cameras around the

---

[4] (Punctuation omitted.) *Med. Center Hosp. Auth. v. Cavender*, 331 Ga. App. 469, 472 (1) (771 SE2d 153) (2015). See also *Johns v. Housing Auth. for the City of Douglas*, 297 Ga. App. 869, 870-871 (678 SE2d 571) (2009).

[5] (Punctuation omitted.) *Mitchell v. Austin*, 261 Ga. App. 585, 587 (583 SE2d 249) (2003), quoting *Shadburn v. Whitlow*, 243 Ga. App. 555, 556-557 (533 SE2d 765) (2000). If the moving party discharges its burden by pointing out an absence of evidence to support the nonmoving party's case, "the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." *Lau's Corp v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991), citing OCGA § 9-11-56 (e).

property; employed security guards in varying hours seven days a week; provided a twenty-four-hour phone number for maintenance and security issues; added an entry gate and landscaping to prevent unauthorized entry; and worked with the resident community, neighborhood watch, and police department to increase involvement and presence in the complex. Hercules also pointed to the lack of expert or other testimony in the record that any additional security measures would have prevented George from being shot after voluntarily opening his door to a stranger after midnight. Stated another way, Hercules argued that there is a lack of evidence on causation – that there is no evidence that its alleged failure to provide adequate security caused George's injuries.[6]

---

[6] George's allegations are that Hercules should have provided more security patrols and failed to properly repair the lock on his door after it was kicked in during a previous burglary. George concedes, however, that the lock was functional after it was repaired, contending instead that the door was tighter and more difficult to close after the repair. His reliance on the maintenance supervisor's admission that the entire front door should have been replaced is unpersuasive because the supervisor testified that he would have replaced the door "[b]ecause it's ugly." More importantly, the door was locked when George's assailants knocked on it, and with knowledge that it was more difficult to lock, he voluntarily opened it, rendering moot the question of the functionality of the lock. Any suggestion by George that the tightness resulting from the lock repair prevented him from re-locking it while in a scuffle with armed men forcing entry into his home is simply too speculative to raise a triable issue of fact.

In response, George points only to the testimony of Celina Nyack, Hercules's community manager, and Joe Bulat, the owner of the security company. While George states that the security company recommended additional security measures, a review of Bulat's deposition belies this assertion. When asked whether he made any recommendations, Bulat replied: "I would have liked to have had more hours, of course, but if I said, do you want to increase the hour? No, they had a budget."[7]

Similarly, George claimed that Hercules's on-site manager "requested more security and surveillance because the tenants were 'at the mercy of criminal activity on the property.'" A closer look at the email written by Nyack shows that on May 21, 2011, she requested more security on weekend days and weekday evenings "[d]ue to the school year ending and the weather inclement [sic]."[8] Nonetheless, there is no

---

[7] The other two record citations George provided to support his contention that the security company recommended more hours do not address this issue.

[8] Nyack's email reads in its entirety as follows:

Good Afternoon All[,] Due to school year ending and the weather inclement, I want to be able to have more coverage either with additional security or more hours. The current schedule is as follows[:] Mon- Thursday -1pm-11[;] Friday- Sunday- 8pm-6am or 7am[.] Ilona or Joe please correct me if I'm wrong[.]

7

evidence or testimony that reducing or increasing security would have affected the crime rate in general or the particular crime that injured George. Rather, the evidence showed that security patrol hours had remained consistent, and the internal incident reports show that crime varied from month to month and year to year.[9]

This evidence is insufficient to create a question of fact on whether George's injuries were proximately caused by any act or omission of Hercules.[10] For example,

My concern is the weekends during the day and the weekdays in the evenings.

Also, we have roughly 6-10 cameras down and also the cameras that are working need to be repositioned and refocused[.] Due to my observations and feedback from residents and staff we have reach[ed] the conclusion that the above is necessary to better reduce liabilities on the property. We need to step up security and surveillance. We are limited right now to foot patrol and observation and along the fence line and behind buildings, we are at the mercy of criminal activity on the property.

[9] For example, as stated previously, in 2008, there was no reported crime between August 5 and December 19. Similarly, there was no reported crime for almost nine months between August 9, 2010, and April 20, 2011.

[10] See *Johns*, 297 Ga. App. at 870-871; *Fallen v. Metro. Life Ins. Co.*, 238 Ga. App. 156, 158-159 (2) (518 SE2d 170) (1999) (physical precedent only) ("expert's opinion that security personnel would have a 'strong deterrent effect on the type of crime that occurred'" was "a conclusory statement" insufficient to create an issue of

in *Johns v. Housing Authority for the City of Douglas*,[11] a tenant was raped after an assailant entered her apartment through a window in which she had placed cardboard to fill a gap between the window and an air conditioning unit she installed.[12] There

---

fact on causation); *Post Properties, Inc. v. Doe*, 230 Ga. App. 34, 38-39 (495 SE2d 573) (1997) (physical precedent only) (to conclude that a witness's contentions regarding insufficient security at an apartment complex, without any evidence of how the plaintiff's assailant accessed the complex, demonstrated a lack of causation that "would require a jury to engage in pure speculation and guesswork. This is neither required nor allowed in this state."); *Collins v. Shepherd*, 212 Ga. App. 54, 56 (2) (441 SE2d 458) (1994) (physical precedent only) ("Plaintiff presents no evidence to show that defendant could have prevented the incident from occurring with a different security system in place. A landowner does not become an insurer of safety by taking some security precautions on behalf of invitees. Undertaking measures to protect patrons does not heighten the standard of care; and taking some measures does not ordinarily constitute evidence that further measures might be required.") (punctuation omitted). Cf. *The Bethany Group, LLC v. Grobman*, 315 Ga. App. 298, 302 (1) (b) (727 SE2d 147) (2012) (affirming denial of summary judgment because there was a question of fact regarding proximate cause based upon evidence of the landlord's knowledge of prior armed robberies and the testimony of the security company manager "that such incidents increased after [the landlord] reduced its security"). But see *FPI Atlanta, L.P. v. Seaton*, 240 Ga. App. 880, 884 (2) (524 SE2d 524) (1999) (physical precedent only) (finding proximate cause due to the foreseeability of the criminal act without analyzing whether a jury question was raised as to causation specifically).

[11] 297 Ga. App. at 869.

[12] See id.

was no evidence indicating how the assailant entered the complex or whether he was a resident.[13]

> To support its motion for summary judgment, the [defendant] Housing Authority pointed to: the lack of evidence showing that any of the allegedly unsafe conditions presented by its failure to repair the fence or increase common area lighting or security patrols proximately caused the attack; evidence that [the plaintiff] had equal or superior knowledge of the allegedly unsafe conditions; and evidence that the unsafe condition that actually allowed the assailant to enter her apartment (i.e., the manner in which she installed the air conditioner window unit) was created by [the plaintiff].[14]

The Court pretermitted the issues of superior knowledge and foreseeability of the attack and assumed that the Housing Authority breached its duty by not making the repairs or improvements suggested by the plaintiff. Nonetheless, we affirmed the grant of summary judgment to the Housing Authority because there was no evidence that any such breach caused the plaintiff's injuries:

> a jury would have to speculate that improvements to security patrols and lighting, and a repair to the fence, would have prevented the assailant from approaching [the plaintiffs'] apartment unit and reaching through

---

[13] See id.

[14] Id. at 870.

her window to gain entry into her apartment. *Speculation that raises a mere conjecture or possibility is not sufficient to create even an inference of fact for consideration on summary judgment.*[15]

Here, a request for more security based upon school ending for the summer and inclement weather, along with a comment that the property along the fence lines and behind the buildings was at the mercy of criminals, coupled with the security company's desire for more hours (though without any request for more), simply does not provide evidence that Hercules proximately caused George's injuries sustained when he was shot after voluntarily opening his door to an unknown person after midnight. Because George failed to meet his burden of demonstrating a triable issue of fact as to proximate cause, summary judgment in favor of Hercules on his negligence claim is proper.

---

[15] (Emphasis supplied.) Id. at 871-872. The Court also noted that the intruder was able to enter the plaintiff's apartment because she left a rear window unsecured, not because the Housing Authority failed to improve security and lighting. See id. at 871. Similarly, in the instant case, the assailants were able to enter George's apartment because he unlocked and opened the door for them.

11

(b) *Nuisance*. Proximate cause is also an essential element in a nuisance claim.[16] As we held in Division 1 (a), George failed to meet his burden of demonstrating a triable issue of fact on this issue, therefore summary judgment in favor of Hercules on his nuisance claim is proper.

(c) *Punitive damages*. "A claim for punitive damages is derivative in nature and will not lie in the absence of a finding of compensatory damages on an underlying claim."[17] Because George's negligence and nuisance claims fail, his claim for punitive damages also fails.

2. *Hercules's counterclaim*. George contends that the trial court erred by granting summary judgment to Hercules on its counterclaim that he breached the lease agreement to pay rent after he was injured. We disagree.

---

[16] *Toyo Tire North America Mfg., Inc. v. Davis*, 299 Ga. 155, 158 (2) (787 SE2d 171) (2016) ("Causation is an essential element of nuisance. . . .") (punctuation omitted).

[17] (Punctuation omitted.) *Ratliff v. McDonald*, 326 Ga. App. 306, 314 (2) (b) (756 SE2d 569) (2014), quoting *D. G. Jenkins Homes, Inc. v. Wood*, 261 Ga. App. 322, 325 (3) (582 SE2d 478) (2003).

12

In response to Hercules's motion,[18] George argued that questions of material fact exist as to whether Hercules's actions and failure to secure his apartment from criminals relieved him of his contractual obligation to pay past-due rent. Specifically, George argued that he should be excused from paying his rent because Hercules's alleged failure to provide adequate security or to adequately repair the lock on his door (1) breached an implied covenant in the lease, and/or (2) constituted constructive eviction.[19] For the reasons that follow, neither of these defenses relieved George of his contractual obligation to pay rent.[20]

---

[18] George did not assert either a defense of constructive eviction or breach of the implied covenant of quiet enjoyment in his answer to Hercules's counterclaim for unpaid rent.

[19] We note that George's defenses arise out of *contract* claims, which are entirely separate from any tort claims that may have arisen out of the same conduct.

[20] George did not argue that Hercules's actions and inactions constituted a breach of an *express* contractual provision. And there is no evidence that Hercules breached an express term of the lease such that George was relieved of his obligation to pay rent. To the contrary, the lease did not require Hercules to provide security:

> [*Hercules*] *does not offer or provide security or law enforcement services for resident's protection or protection of resident's personal property*. [George] agrees to look solely to public law enforcement, emergency services, or fire services for security services or protection. [George] acknowledges that he has an obligation to exercise due care for his own safety and welfare and that [Hercules] is not liable for the

(a) *Breach of implied covenant of quiet enjoyment.* In support of his argument, George cited to this Court's decision in *Jaraysi v. Sebastian*,[21] arguing that Hercules's actions and failures "constitute[d] a breach of the covenant of quiet enjoyment." This argument is without merit.

(i) "A general warranty of title against the claims of all persons includes three separate covenants: (1) a covenant of a right to sell, (2) a covenant of quiet enjoyment, and (3) a covenant of freedom of encumbrances."[22] "To constitute a breach of the covenant of warranty, or for quiet enjoyment, an eviction or equivalent disturbance by title paramount must occur, and the mere existence of an outstanding paramount title will not constitute a breach."[23] Further, "[a] covenant for quiet enjoyment of the premises is necessarily implied in every lease and goes to the extent

---

criminal acts of other persons. (emphasis supplied).

[21] 318 Ga. App. 469 (733 SE2d 785) (2012) (involving a commercial lease and an express contract of quiet enjoyment).

[22] *McMurray v. Housworth*, 282 Ga. App. 280, 285-286 (2) (638 SE2d 421) (2006). See also OCGA § 44-5-62 ("A general warranty of title against the claims of all persons includes covenants of a right to sell, of quiet enjoyment, and of freedom from encumbrances."); *Whited v. Issenberg*, 261 Ga. App. 787, 788 (584 SE2d 59) (2003); *White & Corbitt v. Stewart & Co.*, 131 Ga. 460, 461 (62 SE 590) (1907).

[23] (Punctuation omitted.) *Whited*, 261 Ga. App at 788.

14

of [representing] that the landlord *has a good title* and can give *a free and unencumbered lease* of the premises for the term stipulated."[24]

Thus, to establish a breach of the covenant of quiet enjoyment, George had the burden to prove that Hercules did not have good title to lease him the premises or that someone else had paramount title. George's complaints about the Villas, however, do not concern the issue of a paramount title and, therefore, do not implicate the covenant of quiet enjoyment. Accordingly, George's defense of breach of the implied covenant of quiet enjoyment failed as a matter of law, though for reasons other than those stated by the trial court.[25]

(ii) In granting summary judgment to Hercules on its claim for unpaid rent, the trial court relied on language in this Court's decision in *Jaraysi* to conclude that the actions of third-party criminal actors could not support a finding that Hercules breached the covenant of quiet enjoyment and, therefore, did not relieve George of his obligation to pay rent in this case. We recognize the basis for the trial court's confusion because we have conflated the defenses of breach of the covenant of quiet

---

[24] (Citation and punctuation omitted; emphasis supplied.) *Dwyer v. McCoy*, 236 Ga. App. 326, 329 (5) (512 SE2d 70) (1999).

[25] See *Cieplinski*, 280 Ga. App. at 276 ("a judgment right for any reason will be affirmed").

enjoyment and constructive eviction in our case law, and we take this opportunity to clarify the issue.

The *Jaraysi* decision, upon which the trial court relied, arose out of a series of cases dating back to a case issued by this Court a century ago – *Adair v. Allen*.[26] In *Adair*, this Court addressed the implied covenant for quiet enjoyment in a lease and held that the covenant "does *not* amount to an undertaking on [the landlord's part] that the premises leased are suitable or fitted for the particular use for which they are intended by the lessee[.]"[27] This Court then went on to hold that the implied covenant of quiet enjoyment does *not* apply to a tenant's claims arising from a nuisance created and maintained by a third-party – in that case a co-tenant.[28]

Since 1923, this Court has issued a series of cases that have misinterpreted *Adair* and have been relied upon for the erroneous proposition that the covenant of quiet enjoyment encompasses non-title based claims, such as the defense of

---

[26] 18 Ga. App. 636 (89 SE2d 1099) (1916).

[27] (Emphasis supplied.) Id. at 636 (a)

[28] See id. at 638.

16

constructive eviction.[29] But as stated above, the covenant of quiet enjoyment applies only to claims arising from a landlord's *title* and does not encompass a non-title constructive eviction defense.[30] Thus, *Jaraysi*, *Myung Sung*, *Rucker*, *Topvalco*, *Hardwick*, *Albert Properties*, *Kulman*, *Smith*, *Feinburg*, *Parker*, and their progeny are disapproved to the extent they can be interpreted to hold otherwise.

(b) *Constructive eviction*. We turn now to George's argument that Hercules's failure to provide adequate security or to properly secure his lock constituted constructive eviction, thereby relieving him of his contractual obligation to pay rent. This argument is also without merit.

---

[29] See *Jaraysi*, 318 Ga. App. at 469; *Myung Sung Presbyterian Church Inc. v. North American Assn. of Slavic Churches & Ministries Inc.*, 291 Ga. App. 808, 812-813 (3) (662 SE2d 745) (2008); *Rucker v. Wynn*, 212 Ga. App. 69, 70-71 (1) (441 SE2d 417) (1994); *Topvalco, Inc. v. Garner*, 210 Ga. App. 358, 361 (2) (436 SE2d 25) (1993); *Hardwick v. 3379 Peachtree*, 184 Ga. App. 822, 825 (3) (363 SE2d 31) (1987); *Albert Properties Inc. v. Watkins*, 143 Ga. App. 184, 185 (1) (237 SE2d 670) (1977); *Kulman v. Sulcer*, 99 Ga. App. 28, 29-30 (1) (107 SE2d 674 (1959); *Smith v. Hightower*, 80 Ga. App. 293, 296-297 (2) (55 SE2d 872) (1949); *Feinburg v. Sutker*, 35 Ga. App. 505, 506 (1) (134 SE2d 173) (1926); *Parker v. Munn Sign & Advertising Co.*, 29 Ga. App. 420 (115 SE2d 926) (1923).

[30] See *Adair*, 18 Ga. App. at 636; OCGA § 44-5-62.

A claim for constructive eviction involves the tenantability of leased property and the nature of the repairs required to restore the property to a safe and tenantable condition.[31]

> Two essential elements must be shown to establish the defense of constructive eviction. They are: (1) that the landlord in consequence of his failure to keep the rented building repaired allowed it to deteriorate to such an extent that it had become an unfit place for the [tenant] to carry on the business for which it was rented, and (2) that it could not be restored to a fit condition by ordinary repairs which could be made without unreasonable interruption of the tenant's business.[32]

In other words, to prove a constructive eviction that excuses the payment of rent, there must be proof of

> either an actual expulsion of the tenant, or some act of a grave and permanent character done by the landlord with the intention of depriving the tenant of the [use] of the demised premises. An act may be considered grave in character if it renders the premises untenantable or

---

[31] See *Overstreet v. Rhodes*, 213 Ga. 181, 183-184 (97 SE2d 561) (1957).

[32] (Punctuation and footnotes omitted.) *Jenkins v. Brice*, 231 Ga. App. 843, 844 (1) (499 SE2d 734) (1998). See also *Ellis v. Hartford Run Apts. LLC*, 335 Ga. App. 118, 125 (6) (779 SE2d 103) (2015) (physical precedent only) (holding that the trial court erred by granting summary judgment to landlords on their counterclaim for rent because factual question remained regarding whether tenants were constructively evicted).

unfit for the use and benefit of the tenant in accomplishing one or more of the substantial purposes of the lease.[33]

Thus, for George to meet his burden as the non-movant with regard to his defense of construction eviction, he was required to identify evidence showing a fact question as to whether Hercules committed some act or omission with regard to the property so "grave in character . . . it renders the premises untenantable or unfit for . . . use."[34] Based on the record before us, George failed to do so. The defense of constructive eviction cannot be premised upon the action of a third party,[35] and there is no evidence that Hercules committed the criminal acts in question. And Hercules's alleged failure to provide security or to properly repair his lock do not constitute "act[s] of a grave and permanent character"[36] committed with the intention of depriving George of the use of his apartment such "that it could not be restored to a fit condition by ordinary repairs which could be made without unreasonable

---

[33] (Punctuation and footnotes omitted). *Jenkins*, 231 Ga. App. at 844 (1).

[34] Id.

[35] See, e.g., *Lumpkin v. Provident Loan Society Inc.*, 15 Ga. App. 816, 820-821 (84 SE 216) (1915).

[36] *Jenkins*, 231 Ga. App. at 844 (1).

interruption" of George's activities,[37] nor did they render the apartment uninhabitable.[38]

Accordingly, we affirm the trial court's grant of summary judgment to Hercules on its counterclaim for unpaid rent.[39]

*Judgment affirmed. Andrews, P. J., Ellington, P. J., Boggs, Ray, Branch, and Rickman, JJ., concur. Dillard, McMillian, Mercier, and Peterson, JJ., concur fully in Division 1 and in the judgment. Barnes, P. J., Miller, P. J., Phipps, P. J., and McFadden, J., dissent to Division 1 and concur fully in Division 2.*

---

[37] Id.

[38] See, e.g., *Fleming v. King*, 100 Ga. 449, 452-453 (28 SE2d 239) (1897). See also OCGA § 44-7-15 ("The destruction of a tenement by fire or the loss of possession by any casualty not caused by the landlord or from a defect of his title shall not abate the rent contracted to be paid."). To the extent that the door lock needed further repair, George's remedy under the terms of the lease was to request repairs or to undertake them himself after a reasonable time. See *Swim Dixie Pool Corp. v. Kraemer*, 157 Ga. App. 748, 749 (1) (278 SE2d 448) (1981); OCGA §§ 44-7-13 and 44-7-14 (requiring landlord to keep a premises in repair and limiting a landlord's liability in tort to certain damages).

[39] See *Cieplinski*, 280 Ga. App. at 276.

A16A1090. GEORGE v. HERCULES REAL ESTATE SERVICES,

  INC.


PETERSON, Judge, specially concurring.

I join the majority opinion as to Division 1 in its entirety. For the reasons that follow, I concur in the judgment only as to Division 2 of the majority opinion.

The majority may very well be right that our case law regarding the implied covenant of quiet enjoyment went somewhat awry beginning in 1923. It may also be wrong.[1] But regardless of merits of that question, the majority's analysis does not

---

[1] The majority cites only two authorities for its new definition of the implied covenant of quiet enjoyment: *Adair v. Allen*, 18 Ga. App. 636 (89 SE 1099) (1916), and OCGA § 44-5-62. *See* Op. at 29. Neither authority provides much support for the majority's position. *Adair*'s holding was simply that actions of third parties do

convince me that the subsequent century of precedent must now be set right. The majority ignores stare decisis, which in my view counsels against overruling what, by this time, some might call a venerable principle of Georgia law. Accordingly, I respectfully disagree with the conclusion of Division 2(a)(ii) overruling a near-century of our caselaw and, thus, cannot join in the analysis that follows it.[2]

---

not create liability for a landlord under the implied covenant of quiet enjoyment, Adair, 18 Ga. App. at 636-37, which was precisely the conclusion of our Court in *Jaraysi* and the trial court here. And the statute does not address the question at all; although recognizing the existence of the covenant of quiet enjoyment, nothing in the statutory language defines the scope of that covenant. This statute has remained substantially unchanged throughout the many decades of the very case law the majority now seeks to change, and at no point has the General Assembly seen fit to correct our course. (This is not to say that the General Assembly's silence should be read as acquiescence in our erroneous interpretation of a statute; indeed, our case law on this point has not "interpreted" OCGA § 44-5-62 at all.)

[2] To be fair, the word "overruled" is not one the majority employs. Instead, using language we normally employ to signal a clarification of ambiguous caselaw, it says only that our cases are "disapproved to the extent they can be interpreted to hold" that the covenant of quiet enjoyment "encompass[es] a non-title constructive eviction defense." But the cases do in fact hold precisely that, and do so clearly. *See*, *e.g.*, *Myung Sung Presbyterian Church Inc. v. N. Am. Ass'n of Slavic Churches & Ministries Inc.*, 291 Ga. App. 808, 812-13 (3) (662 SE2d 745) (2008) (lessor breached covenant of quiet enjoyment when it "substantially interfered with the lessee's right to use and enjoyment of the premises" by failing to apply for a zoning variance renewal). And thus the majority is in fact overruling these decisions, not merely clarifying them.

2

"The bench and bar are entitled to rely on long-standing case law," *Norred v. Teaver*, 320 Ga. App. 508, 515 (740 SE2d 251) (2013) (Andrews, P. J., concurring), and so it is here. The rule the majority overrules today is long-standing case law. The majority does not attempt to explain why that rule is unworkable, or how the last century of experience has shown it to be unwise. Instead, the majority simply declares that the rule developed in error as though that were the end of the matter. But the principle of stare decisis does not even begin to apply until we have already concluded that a prior decision was wrong. "Indeed, stare decisis has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015). For that reason, "it is not alone sufficient that we would decide a case differently now than we did then. To reverse course, we require as well what we have termed a special justification – over and above the belief that the precedent was wrongly decided." *Id*. (citations and punctuation omitted).[3]

---

[3] As I use it in this opinion, the term "stare decisis" refers exclusively to principles that apply to our exercise of discretion in adhering to or overruling our own prior precedent when we have come to disagree with that prior precedent. This term should not be understood to include what we have occasionally referred to as "vertical stare decisis." *See, e.g.*, *Whorton v. State*, 321 Ga. App. 335, 339 (2013) (741 SE2d 653) ("vertical stare decisis dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia"). Vertical stare decisis is

3

Our Supreme Court has identified several factors to consider in deciding whether stare decisis counsels in favor of retaining a precedent that differs from what we might hold if approaching the question with a clean slate. These include "(1) the age of the precedent, (2) the reliance interests at stake, (3) the workability of the decision, and, most importantly, (4) the soundness of its reasoning." *Harrison v. McAfee*, 338 Ga. App. 393, 401 (2) (c) (788 SE2d 872) (2016) (*citing State v. Jackson*, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010)); *see also Benefield v. Tominich*, 308 Ga. App. 605, 613 (708 SE2d 563) (2011) (Blackwell, J., concurring dubitante) (considering other factors). The majority considers nothing beyond the correctness of the long-standing case law it now overrules. At no point in the

simply another way of articulating the command – foundational to the rule of law – that we must follow the decisions of the Supreme Court of the United States and the Supreme Court of Georgia even when our own prior precedent may be inconsistent. This principle is mandatory and does not involve any discretion on our part. *See also* Ga. Const., Art. VI, Sec. VI, Para. VI ("The decisions of the Supreme Court shall bind all other courts as precedents."). Our own internal rules require us to employ the same process – the participation of all active and non-disqualified judges of our Court – to overrule our prior precedent whether we do so because (1) our prior precedent is now inconsistent with binding decisions of a higher court or (2) we have merely come to view that prior precedent as wrongly decided. It is only in the latter case that we have the option of retaining "incorrect" precedent, and so only in the latter case are considerations of stare decisis relevant.

4

appellate briefing or oral argument did the parties challenge our precedent in any way (a failure that is itself a factor that we have recognized counsels strongly against overruling, *see Benefield*, 308 Ga. App. at 613 (Blackwell, J., concurring dubitante)), much less explain why stare decisis does not apply. And my own independent weighing of the applicable factors suggests little reason to overrule anything in this case.

A final consideration also supports my conclusion. Stare decisis applies with the least force to constructions of the United States or Georgia Constitutions. *See Smith v. Baptiste*, 287 Ga. 23, 30 (694 SE2d 83) (2010) (Nahmias, J., concurring) (stare decisis "is less compelling when ... the issue is the meaning of a constitutional provision"). "That is because it is much harder for the democratic process to correct or alter [a court's] interpretation of the Constitution than [its] interpretation of a statute or regulation." *Id*. And although stare decisis applies more strongly in cases of statutory construction, *see id.*, faithful adherence to the separation of powers counsels us that it is unwise lightly to persist in erroneous constructions of validly enacted statutes. *See Harrison*, 338 Ga. App. at 401-02; *cf. Jackson*, 287 Ga. at 659 (5) n.8 (it is "perilous to rely heavily on legislative silence and inaction to conclude that a court's interpretation of a statute is correct"). But here, the precedent we

5

consider has not interpreted the Constitution or a statute, it has instead merely answered questions the General Assembly had not yet addressed. In such a case, separation of powers considerations are at their nadir, leaving stare decisis to operate more forcefully.

The trial court faithfully applied long-standing precedents of this Court. I would leave those precedents undisturbed and affirm. For these reasons, I concur in the judgment only as to Division 2. I am authorized to state that Judge Dillard, Judge McMillian, and Judge Mercier join in this special concurrence.

A16A1090. GEORGE v. HERCULES REAL ESTATE SERVICES,    MI-45
   INC.


MILLER, Presiding Judge, dissenting in part and concurring in part.

I must respectfully dissent to Division 1 of the majority's opinion because there is a genuine issue of material fact for the jury to resolve on the element of causation. Although the trial court found that Hercules breached its duty to George, the trial court's order clearly made no finding as to causation. Where a jury question remains, summary judgment is improper. Consequently, I would reverse the trial court's judgment.

George's apartment complex, the Villas, was infected by rampant crime. These crimes included a homicide, a sexual assault, armed robberies, and 66 break-ins to both occupied and vacant units. Hercules's management was aware of each of these crimes at the apartment complex, yet it still failed to notify the tenants that many of these crimes occurred.

Moreover, despite these numerous crimes, Hercules's management refused to employ security guards after hours or overnight, when the crimes were most prevalent, and it even rejected its own on-site manager's specific request for additional security. In fact, Hercules's management failed to tell its tenants that the security guards who were present were hired only for the purpose of protecting the property in units that were being refurbished, not for the purpose of protecting tenants and guests.

Although the apartment complex was a "gated community," the front "gate" was only a 1-by-6 board, which did not deter foot traffic. Moreover, even though Hercules's management knew that the property adjacent to the apartment complex had a high crime rate, and that the areas behind the complex and along its fence line were "at the mercy" of criminals, the management only sporadically repaired the frequent holes in the fence. Importantly, the night before George's home invasion, an

2

armed robber fled through a hole in the fence after robbing someone, and, a police report completed after George was shot showed that the suspects fled on foot towards a road adjacent to one of the holes in the fence. Although there were security cameras on the property, the cameras were positioned too high to distinguish faces or licence plates in the recordings, and for reasons unknown Hercules had rejected a former property manager's request to fix that problem.

Given the evidence in the record that Hercules's management knew that its security measures had failed to remedy the rampant crime at the apartment complex, this Court should not conclude that this is a "clear and indisputable case" that removes the issue of causation from the jury's purview. See *Woodbury v. Whitmire*, 246 Ga. 349, 350 (1) (271 SE2d 491) (1980). Accordingly, the majority's conclusion that summary judgment is proper on this ground as to George's claims for negligence, nuisance, and punitive damages is legal error.

This conclusion does not end this Court's inquiry, however, because the trial court based its ruling on its erroneous finding that George assumed the risk of harm as a matter of law. With regard to assumption of the risk, Georgia law is clear that "[i]f the plaintiff by ordinary care could have avoided the consequences to himself

3

caused by the defendant's negligence, he is not entitled to recover." OCGA § 51-11-7.

The important focus in this analysis is the scope of George's knowledge of the risk he faced at the apartment complex. For George's recovery to be barred, he must have had knowledge of "the *specific, particular risk of harm* associated with the activity or condition" that proximately caused his injury. (Citation and punctuation omitted; emphasis supplied.) *Monitronics Intl., Inc. v. Veasley*, 323 Ga. App. 126, 139 (4) (746 SE2d 793) (2013). As with causation, assumption of risk is ordinarily a question for the jury. *Desai v. Silver Dollar City, Inc.*, 229 Ga. App. 160, 166 (5) (493 SE2d 540) (1997).

Here, the trial court erred in finding that George assumed the risk of harm *as a matter of law*. Certainly, a jury could find that George's decision to open the door that night bars his claims, however, a jury could also find that George did not appreciate the specific risk of armed home invaders when he decided to answer the door to his own home in response to someone knocking. Thus, whether George assumed the risk of harm is for the jury to decide.

The trial court's reliance on *Landings Ass'n, Inc. v. Williams*, 291 Ga. 397, 399 (728 SE2d 577) (2012) is misplaced because that case is entirely distinguishable on its facts. In *Landings*, our Supreme Court relied on the plaintiff's knowledge that

4

alligators are dangerous to conclude that the plaintiff knowingly assumed the risk of harm by walking around areas she knew were inhabited by wild alligators. Id.

Here, George was injured when he opened the door to his own home and was shot by unknown criminals. To conclude that George assumed the *specific risk of harm* would establish a standard in which a person opening the door to his own home is, as a matter of law, at the mercy of whomever lurks on the other side. This is not the current state of the law in Georgia, and thus the trial court erred in granting summary judgment on this ground.

For the above reasons, the trial court's order must be reversed. Accordingly, I respectfully dissent to Division 1 of the majority opinion. I am authorized to state that Presiding Judge Barnes, Presiding Judge Phipps, and Judge McFadden join in this dissent.

5

A16A1090. GEORGE v. HERCULES REAL ESTATE SERVICES,    BA-045
      INC.


BARNES, Presiding Judge, dissenting in part and concurring in part.

I concur fully and completely with the majority on Division 2, disapproving the cases conflating the doctrines of quiet enjoyment and constructive eviction but finding no constructive eviction in this case. I fully join Presiding Judge Miller's well-stated dissent to Division 1, as I am also unprepared to hold as a matter of law that opening the door at night automatically absolves a landlord of all responsibility for its failure to stem a pervasive crime wave or to effect adequate repairs. I write to further emphasize that, in addition to evidence that the management company breached its duty of ordinary care with its tepid response to the rampant crime wave

on its property, a jury could also find that it breached its duty by making a substandard repair to George's door after burglars kicked it in.

George presented evidence that the shoddy repairs made it difficult to lock the door and prevented him from throwing the deadbolt to secure the door against the invaders, who then pushed their way inside and shot him. Photographs of the door and strike plate taken by the police after the home invasion reveal just how badly the repair was made. The strike plate was crooked, was missing screws, and partially blocked the hole in the doorframe into which the deadbolt should seat. The deadbolt was the only lock on George's front door; the knob was for a passage door, "like a closet," and did not have a lock built into it.

Expert testimony is not required to determine whether the burglar wrap was installed in a way that could make it difficult for the bolt to seat into the doorframe. Determining whether the hole into which the dead bolt should seat is misaligned or partially blocked by a metal wrap is akin to a child determining whether a round block fits into a square hole. See *Demarest v. Moore*, 201 Ga. App. 90, 91-92 (410 SE2d 191) (1991) (alleged statement by police at local meeting that deadbolt was insufficient to prevent break-ins unless the hardware was secured to a structural member of door frame with 3½" screws was sufficient to create jury question where

2

the deadbolt to plaintiff's burgled apartment was attached with 3/8" and ½" screws). Whether that repair — which caused the deadbolt to become misaligned with the hole into which it should seat — caused or contributed to George's inability to close and bar the door against the armed intruders is a question well within the ken of an ordinary juror.

For these reasons, as well as those expressed in Presiding Judge Miller's dissent, I dissent in part to the majority opinion. I am authorized to say that Presiding Judge Miller, Presiding Judge Phipps, and Judge McFadden join in this dissent.